51 F.3d 1308
 63 USLW 2602, 99 Ed. Law Rep. 732,
19 Employee Benefits Cas. 1097,
Pens. Plan Guide P 23908R
 LUTHERAN HOSPITAL OF INDIANA, INCORPORATED, Mary L. Isch and
William A. Isch, Plaintiffs-Appellants,
and
Saint Joseph Medical Center, Intervening Plaintiff-Appellant,
v.
BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA, Acordia Local
Government Benefits, Incorporated, Associated Insurance
Companies Incorporated, doing business as Blue Cross/Blue
Shield of Indiana, et al., Defendants-Appellees,
v.
TEAMSTERS LOCAL 135 WELFARE FUND, Defendant-Appellant.
 No. 94-2731.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 2, 1994.
Decided March 20, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied April
28, 1995.
 
 Frank J. Gray (argued), James A. Federoff, Craig Roy Patterson, Beckman, Lawson, Sandler, Snyder & Federoff, Fort Wayne, IN, for Lutheran Hosp. of Indiana, Inc., Mary L. Isch, William A. Isch.
 Frederick W. Dennerline, III (argued), Fillenwarth, Dennerline, Groth & Towe, Indianapolis, IN, Stephen J. Lerch, Fort Wayne, IN, for Teamsters Local 135 Welfare Fund.
 T. Jeffrey Hannah, Margaret A. Jones (argued), Indianapolis, IN, for Acordia Local Government Benefits, Inc., Associated Ins. Companies Inc.
 George N. Bewley, Jr., Bewley & Koday, Fort Wayne, IN, William W. Hinkle, Hinkle, Racster & Lopez, Portland, IN, for Community and Family Service, Inc.
 Vincent J. Heiny, Haller & Colvin, Fort Wayne, IN, for Saint Joseph Medical Center.
 Before CUMMINGS, BRIGHT* and COFFEY, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 The issue in this case is whether a laid-off employee is ineligible for COBRA continuation health care coverage because of her preexisting coverage under the group health plan provided by her husband's employer.
 
 Background
 
 2
 In 1986 Congress passed the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), which amended the Public Health Service Act ("PHSA"), the Employee Retirement Income Security Act ("ERISA") and the Internal Revenue Code ("the Code"). The COBRA amendments to ERISA, 29 U.S.C. Secs. 1161-1168, provide that individuals who lose coverage under their employer's group health plan due to certain qualifying events, e.g., lay-off or reduction in hours, may continue their coverage in the group health plan at their own expense for a period of 18 or 36 months depending on the qualifying event. The continuation coverage must be identical to that received by any "similarly situated beneficiaries under the plan" who have not had a qualifying event. 29 U.S.C. Sec. 1162(1).
 
 
 3
 The critical provision for the present case, 29 U.S.C. Sec. 1162(2), provides in relevant part that:
 
 
 4
 The coverage must extend for at least the period beginning on the date of the qualifying event and ending not earlier than the earliest of the following
 
 
 5
 . . . . .
 
 
 6
 (D) The date on which the qualified beneficiary first becomes, after the date of election--
 
 
 7
 (i) covered under any other group health plan (as an employee or otherwise) 'which does not contain any exclusion or limitation with respect to any pre-existing condition of such beneficiary.'
 
 
 8
 As originally passed in April of 1986, 29 U.S.C. Sec. 1162(2)(D)(i) read, "a covered employee under any other group health plan." COBRA Pub.L. No. 99-272, Sec. 10002(a), 100 Stat. 82, 228. In October of 1986 it was amended to read, "covered under any other group health plan (as an employee or otherwise)." Tax Reform Act, Pub.L. No. 99-514, Sec. 1895(d)(4)(B)(ii), 100 Stat. 2085, 2938. Finally in 1989 Congress amended the statute again, adding the " 'which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary' " language, bringing it to its present form. The "first becomes, after the date of the election" qualifying language was in the original statute and has remained unchanged through this series of amendments.
 
 
 9
 The facts in this case were largely stipulated by the parties. Mary Isch was admitted to Wells Community Hospital of Bluffton, Indiana, on April 28, 1991.[1] She was transferred to Lutheran Hospital of Indiana two days later and transferred again to St. Joseph Medical Center on September 26, 1991, and discharged December 27, 1991. At the time of her hospitalization, she was a teacher at Community and Family Services, Inc. ("Community") and received group health insurance under the Community group health insurance plan provided through Business Men's Assurance Company of America ("BMA"). She was also a covered dependent under her husband's group health insurance provided by the Teamsters Local 135 Welfare Fund ("Teamsters").
 
 
 10
 On May 1, 1991, Mary Isch took a leave of absence from her employment because of her illness. On May 25, 1991, Mary Isch and the other teachers at Community were laid off for the summer. Effective June 1, 1991, Community switched insurers from BMA to Associated. In early June 1991, an Associated representative told Community that Mary Isch would not be eligible for COBRA coverage because of her coverage under the Teamsters' plan.
 
 
 11
 Plaintiffs brought suit in the Northern District of Indiana on July 13, 1992, seeking a declaratory judgment as to which if any of the four named defendants[2] was responsible for providing benefits to Mary Isch after June 1, 1991. St. Joseph Medical Center intervened in the action on June 14, 1993, with a complaint against the Isches and all defendants. All parties filed motions for summary judgment on July 17, 1993. The district court granted summary judgment against Teamsters and in favor of the other defendants, finding that Mary Isch had lost her coverage due to a qualifying event but was not entitled to COBRA continuation coverage because of her preexisting coverage under the Teamsters' plan. 845 F.Supp. 1275 (N.D.Ind.1994).[3] Teamsters appeal the district court's ruling holding them exclusively liable for Mary Isch's medical costs. Plaintiffs appeal the district court's ruling that Acordia and Associated are not also liable. Both plaintiffs and Teamsters contend that Associated is primarily and Teamsters secondarily liable for Mary Isch's medical expenses.
 
 Discussion
 
 12
 Three other Circuits have addressed this issue with differing results.[4] In Oakley v. City of Longmont, 890 F.2d 1128 (10th Cir.1989), certiorari denied, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944, the plaintiff was covered under both his employer's and his wife's group health plans. Plaintiff suffered a serious head injury in an auto accident. His employer ultimately terminated him and discontinued his health coverage. His employer also denied plaintiff continuation coverage because of his preexisting coverage under his wife's health plan. The Tenth Circuit held that the clear language of the statute "cannot be construed to include a spouse's preexisting group plan as a condition to terminate continuation coverage." Id. at 1132. Consequently the defendant city was required to provide continuation coverage to its previously covered plaintiff employee. Because the plaintiff needed expensive rehabilitation not covered by his wife's plan, the court noted that
 
 
 13
 [s]urely the facts of this case illustrate the precise gap in coverage which troubled Congress. Mr. Oakley was terminated because of a catastrophic event which otherwise would have put his family at risk and jeopardized his treatment had the continuation rules not been in effect to maintain his rehabilitation for a limited period of time. (Emphasis supplied.).
 
 
 14
 Id. at 1133.
 
 
 15
 In Brock v. Primedica, Inc., 904 F.2d 295 (5th Cir.1990), the Fifth Circuit ignored the clear holding of the Oakley court and fastened instead on the above-quoted reference to a "gap," holding that since the plaintiff, Karen Brock, suffered no gap between her employer's plan and her preexisting coverage under her husband's plan she was not entitled to continuation coverage.
 
 
 16
 The Eleventh Circuit in National Companies Health P. v. St. Joseph's Hosp., 929 F.2d 1558 (11th Cir.1991), recognized the conflict between Oakley and Brock and embraced the Fifth Circuit's gap analysis. The court held that
 
 
 17
 [i]n the case of an employee covered by preexisting group health coverage ... such an employee is ineligible for continuation coverage ... [unless] there is a significant gap between the coverage afforded under his employer's plan and his preexisting plan.
 
 
 18
 Id. at 1570-71. Faced with these conflicting holdings, this Court shall proceed with our own analysis of the relevant COBRA statute and its application to the present case.
 
 
 19
 In attempting to effectuate Congress' intent we start--and if it is "sufficiently clear in its context," end--with the plain language of the statute. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384-85, 47 L.Ed.2d 668. 29 U.S.C. Sec. 1162(2)(D)(i) provides that an employer can terminate continuation coverage on
 
 
 20
 The date on which the qualified beneficiary first becomes, after the date of the election--
 
 
 21
 (i) covered under any other group health plan (as an employee or otherwise) which does not contain any exclusion or limitation with regard to any pre-existing condition of such beneficiary.
 
 
 22
 The statute clearly provides that the employee's right to continuation coverage terminates only when he or she first becomes, after the election date, covered by any other group health plan. The statute does not say that an employee is ineligible for continuation coverage if he or she is covered by a preexisting group health plan. Nor does the statute say that a beneficiary's rights terminate when he or she becomes eligible for additional or alternative group health insurance. Therefore, an employee loses the right to continuation coverage only if he or she chooses after the election date to accept coverage under another group health plan.
 
 
 23
 The statutory distinction between preexisting and after-acquired health care coverage is reasonable and facilitates the preservation of the beneficiary's health care status quo. The plain language of the statute dictates that an individual only loses COBRA eligibility if he or she chooses to accept alternative group health insurance after the qualifying event. By the terms of the statute, the individual has the choice whether to preserve the status quo and continue the prior level of coverage under COBRA or accept alternative coverage and discontinue COBRA. In either case, for the 18- or 36-month statutory period provided in 29 U.S.C. Sec. 1162(2)(A), the individual is never forced to accept a lower level of health care coverage than he or she received as an employee before the qualifying event.
 
 
 24
 If on the other hand the language of the statute is ignored and preexisting double coverage disqualifies one from COBRA continuation coverage, upon termination an employee's status quo is not preserved and the level of coverage automatically drops to the level provided by the preexisting coverage as a beneficiary of a spouse's employer's plan. In many instances that level of coverage will be perfectly adequate and no harm will be suffered by the individual because the prior double coverage was in fact redundant. But those situations are not the ones we or Congress are concerned with, because in those situations the individual will not pay the premiums to continue COBRA coverage that he or she does not need. In situations in which double coverage is in fact redundant and unnecessary, whether or not COBRA coverage is available is a non-issue because no one would choose to pay the premiums to obtain it. Therefore, we, like Congress, must focus on those cases in which the double coverage is not completely redundant. The question then becomes whether individuals should be forced to accept what they perceive to be inadequate coverage and be denied the "privilege" to pay (up to 102% of the cost) to maintain their prior level of coverage. The plain language of the statute says "no."
 
 
 25
 Nonetheless, the district court and the Eleventh Circuit in National reached a different conclusion. In so doing they relied on what they posited to be Congress' intent "that the obtention, in any manner, of almost any group health coverage would justify an ERISA-plan sponsor's termination of continuation coverage." National, 929 F.2d at 1571. How and from where these courts divined this intent is not clear. The National court cites Congress' description of its amendment to ERISA's "other coverage" termination provision as providing for the "[t]ermination of continuation coverage by [an]other group health plan rather than upon reemployment or remarriage." Tax Reform Act, Pub.L. No. 99-514, Sec. 1895(d)(4), 100 Stat. 2085, 2938. Yet Congress' determination that the circumstances giving rise to post-election coverage are irrelevant does not in any way undermine the statutory distinction between coverage accepted after election and preexisting double coverage.
 
 
 26
 In fact, there is little legislative history which illuminates Congress' intent in enacting COBRA and none which relates to the timing provision at issue here. Instead, the district court and the National court relied on Congress' supposed general intent in passing the COBRA amendments to ERISA, "to provide some continued access to affordable private health insurance--not the maintenance of every employee's insurance status quo." Lutheran Hosp., 845 F.Supp. at 1287. The legislative history from which this "true intent" is gleaned is the claim that "[t]he COBRA amendments to ERISA were enacted in response to 'reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay.' " National, 929 F.2d at 1567 (quoting H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, 1986 U.S.Code Cong. & Admin.News 42, 622).[5]
 
 
 27
 This assertion of general motivation hardly seems sufficient to override the clear language of the statute. Moreover, neither the statute nor the proposed COBRA regulations support the contention that Congress intended COBRA to require only "bare-bones" coverage and not the preservation of the employee's status quo. Preservation of the status quo is exactly what 29 U.S.C. Sec. 1162(1) requires:
 
 
 28
 The coverage must consist of coverage which as of the time the coverage is being provided, is identical to the coverage provide under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred.
 
 
 29
 The Treasury Department's proposed COBRA regulations further undercut the notion that Congress intended to require only "bare-bones" continuation coverage.[6] Under the proposed regulations, if the employer offers a "cafeteria" plan, which gives employees a choice among various group health plans, a COBRA beneficiary must be allowed the same freedom as current employees to choose a new plan during any open enrollment periods occurring while he is receiving continuation benefits. 52 Fed.Reg. 22,716, 22,723. Similarly, if an employer offers a core plan and separate vision and dental plans, an employee previously covered under all three may choose to continue any or all of the three. Id. at 22,726. An employee covered only by the vision or dental plan may choose to continue coverage under just that plan. Id. at 22,727.
 
 
 30
 After holding that preexisting coverage was disqualifying, the Eleventh Circuit in National went on to say:
 
 
 31
 There may be, however, instances when, despite coverage under a preexisting group health plan, an employee is entitled to receive continuation coverage under his previous employer's ERISA plan. If there is a significant gap between the coverage afforded under his employer's plan and his preexisting plan, an employee will be eligible for continuation coverage. This is because, in that situation, the employee is not truly "covered" by the preexisting group health plan as that term is used by Congress to effectuate its intent.
 
 
 32
 National, 929 F.2d at 1571. Courts which have held that preexisting coverage was disqualifying have attempted, under the guise of this "gap analysis," to avoid the harshest results of their statutory misreading. Predictably, this analysis has resulted in a "gap" morass, inviting judicial line-drawing in the absence of any specific criteria much less congressional authorization. The National court's approach was invented from whole cloth to fill a void resulting from its misreading of the statute.
 
 
 33
 Congress' 1989 amendment limiting disqualification under 29 U.S.C. Sec. 1162(2)(D)(i) to subsequent coverage under a group health plan "which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary" does not buttress or affirm the type of "gap" analysis courts are forced to engage in if they ignore the language of Sec. 1162(2)(D) and treat pre-existing double coverage as disqualifying. None of the potential "gaps" that concerned the courts in Oakley, Brock, National, or the present case are the result of a preexisting condition exclusion or limitation.[7]
 
 
 34
 The amendment does not speak of "inferior" or "non-comparable" coverage, and therefore does not authorize courts to make such comparisons and determinations. Only by ignoring the language of the amendment and finding its "true import" to be a guarantee of "comparable coverage" can the dissent avoid the admittedly draconian situation--that inferior pre-existing insurance would disqualify one from receiving COBRA coverage--that results when the dissent disregards the plain language of the statute itself. The alternative is to honor the plain language of both the statute and the amendment and let the terminated employee--who bears the risk and pays the premium--rather than a court determine what is or is not comparable coverage.
 
 
 35
 If instead we accept the position of the National court and the dissent, we are left with the question of how a court determines what is a significant gap in coverage. The National court found no gap in coverage even though the individuals involved were personally responsible for $6,700 in medical expenses because they were not able to continue their dual coverage. National, 929 F.2d 1558. In McGee v. Funderburg, 17 F.3d 1122 (8th Cir.1994), the Eighth Circuit found personal liability of over $7,500 to be a significant gap and thus allowed COBRA continuation coverage without reaching the issue whether preexisting double coverage was disqualifying. Does the magnitude of personal liability sufficient to constitute a gap depend on the ability of the individual to pay or on the overall scale of their medical expenses?[8] These questions are ones which courts should not ask or answer without congressional authorization or direction. The only gap that should be relevant and judicially cognizable is that perceived by the insured individual who chooses to pay the COBRA premiums to continue her additional coverage.
 
 
 36
 In the present case the district court compared the Teamsters and Associated plans and determined that there was no "significant" gap, despite the fact that under the Teamsters plan the Isch family may be personally liable for $35,000. 845 F.Supp. at 1288. The court determined that the Isches' actual personal liability was an illegitimate post hoc consideration. Id.
 
 
 37
 [I]t would not be a proper function of the court to look with hindsight at the bills actually incurred in a given illness/accident so as to determine a beneficiary's personal exposure under each policy, and from that determine whether a violation of COBRA has occurred.
 
 
 38
 Id. at 1289. Instead, the district court attempted to put itself in the position of the employer at the time of the qualifying event:
 
 
 39
 So, the Court should view these policies as if a choice had to be made in June 1991, knowing full-well that the Patient has Guillane-Barre Syndrome, but not knowing her future medical costs or their duration.
 
 
 40
 Id. From this ill-defined and artificial vantage point the court concluded that there was no significant gap between the Teamsters plan, which had a $250,000 yearly maximum but no lifetime limit, and the Associated plan which had no yearly limit but a $1 million lifetime limit. We agree that a post hoc determination of personal liability is an inappropriate way to determine preexisting legal duties. But the fictional ex ante approach taken by the district court is no more appropriate and completely unworkable. How much information about the patient's physical and financial condition is the court to presume of the employer in making this after-the-fact comparison? Is the court to apply an objective or subjective standard, i.e., is it what the employer knew or what a reasonable employer should have known? How does an employer calculate the gap based on whatever information he is presumed to have? Must an employer utilize an actuary and medical expert to determine the likely effect of policy differences given the patient's physical condition at the time of the qualifying event?
 
 
 41
 This whole morass can be avoided by honoring the language of the statute and the decision of the insured as to how much coverage is adequate for her own situation. Under a proper application of the statute, the employee obtains no windfall. She is only allowed to preserve the level of coverage she determined was appropriate before her termination and was willing to pay to continue afterward.
 
 Conclusion
 
 42
 Mary Isch is not disqualified from obtaining COBRA coverage because of her preexisting coverage under her husband's Teamsters' plan. The district court's grant of summary judgment against Teamsters is reversed and the case is remanded to the district court for further proceedings consistent with this opinion. In addition, the district court's grant of summary judgment in favor of Associated and its denial of appellants' motion for summary judgment against Associated are reversed.
 
 
 43
 COFFEY, Circuit Judge, dissenting.
 
 
 44
 The majority's opinion places more importance on grammar and syntax than on Congress' clear intent in enacting COBRA and its subsequent amendments.[1] The goal of COBRA, 29 U.S.C. Secs. 1161-1168, is to provide temporary health insurance to those people whose jobs are voluntarily or involuntarily terminated, and are without health insurance other than COBRA coverage. COBRA insurance is not, nor has it ever been intended to provide adjunct or double health insurance coverage for those who are covered under another pre-existing policy. Mrs. Isch and Lutheran Hospital are named plaintiffs in this action when in truth and in fact, the argument is between Associated and the Teamsters, two insurance companies who are attempting to avoid the payment of her medical expenses. Mrs. Isch was covered under her husband's Teamsters' health insurance policy, there was no limitation or exclusion on the coverage of her medical expenses for Guillane Barre Syndrome, and there is no evidence in the record that one policy provides any more coverage than the other does. Because it was not the intent of Congress to provide for dual health care coverage, and because the policies are comparable, I respectfully dissent from the majority opinion.
 
 
 45
 COBRA was enacted in response to "reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay." H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986 U.S.Code Cong. & Admin.News 579, 622 (emphasis added). COBRA is the legislative "effort to provide continued access to affordable private health insurance for some" of those without insurance, id., without increasing "the staggering budget deficits now facing the United States." S.Rep. No. 146, 99th Cong., 2d Sess. 3, reprinted in 1986 U.S.Code Cong. & Admin.News 42, 43.
 
 
 46
 Although the legislative history surrounding COBRA may be scant, that which does exist makes it clear that COBRA coverage was designed specifically for employees, and their dependents, who would have no insurance coverage at all as a result of termination of their present jobs. The majority, for reasons unexplained in its decision, in my opinion is in error when it states that these motivating statements made by Congress are mere "snippets," or that my reasoning turns solely on the use of the word "any." Rather, these statements are an accurate interpretation of Congressional intent in enacting COBRA, and I consider them in their totality. While the majority is correct that the plain language of a statute is the "most reliable indicator of congressional intent," in this case, the legislative history and language of the statute are not at odds. I agree with the Eleventh Circuit and its interpretation of 29 U.S.C. Sec. 1162(2)(D)(i):
 
 
 47
 Congress enacted COBRA because it was concerned about the fate of individuals who, after losing coverage under their employer's ERISA plan, had no group health coverage at all. Continuation coverage would afford these individuals group health coverage until they were able to secure some other coverage. Recognizing the substantial costs continuation coverage would place on employer-operated ERISA plans, and thus beneficiaries of these plans, Congress did not make continuation coverage infinite in duration.... Congress provided for certain terminating events. One such event is the beneficiary's obtention of other group health coverage. This provision is consistent with the goals of COBRA.... When these individuals obtain their new coverage, coverage under their former ERISA plan is unnecessary.... in such a setting, the concerns that motivated Congress' enactment of COBRA generally are not present; the employee has group health coverage.... In the case of an employee covered by preexisting group health coverage, the terminating event occurs immediately; the first time after the election date that the employee becomes covered by a group health plan other than the employer's plan is the moment after the election date. In effect, such an employee is ineligible for continuation coverage.
 
 
 48
 National Cos. Health P. v. St. Joseph's Hosp., 929 F.2d 1558, 1569-70 (11th Cir.1991).
 
 
 49
 There is nothing in the language of this statute to suggest that termination of the right to COBRA coverage cannot occur simultaneously with the triggering of the right to coverage, if a person continues comparable coverage under a pre-existing health plan. The majority, by design, incorrectly summarizes my position as being that COBRA only provides for those who have no insurance at all, rather than to provide coverage for those individuals whose employment and health insurance are simultaneously terminated. To the contrary, my position is exactly what the majority attempts to say it is not. COBRA was enacted to provide interim health coverage (18-36 months) for those whose employment is changed or terminated. Obviously, if a person has comparable insurance under another policy, there is no necessity for COBRA coverage, and the statute terminates their ability to elect COBRA coverage. My interpretation of this provision protects exactly the subclass that the majority wishes to protect--those who lose "all or part of their insurance" as a result of losing their jobs. The majority, for reasons unenumerated, states that Mrs. Isch lost part of her insurance coverage, but it fails to specify exactly what insurance coverage she lost.
 
 
 50
 In this case, the Teamsters' policy had a $250,000 yearly maximum on major medical expenses whereas Associated's plan had a $1,000,000 lifetime limit on major medical. The district court correctly noted that "[l]ooking at both policies, one could easily come to the conclusion that an annual cap (but with no lifetime limit) would have been the best thing for someone suffering from Guillane-Barre Syndrome and its potential residual effects." Additionally, the record is unclear as to whether all of Mrs. Isch's medical expenses are properly classified as major medical. The respective parties to the litigation are at odds as to this point, for the Teamsters argue that she is potentially liable for up to $35,000 in expenses, while Associated claims that not all of her current expenses are major medical expenses.[2] From my review of the record, the briefs, and oral argument, I am unable to locate any evidence that resolves this controversy, but my dissent does not turn on its resolution. These figures are not only speculative but they are also the product of hindsight. Both the district court and the majority agree that we should not engage in post hoc determinations of insurance policies and their coverage. Rather, the policies must be assessed at the time that a person has the right to elect COBRA benefits because of termination of employment.
 
 
 51
 The majority's opinion has the effect of mandating dual coverage by pre-existing insurance plans and COBRA. While some of these people may have chosen to have dual coverage[3] while employed, I wish to make it clear that COBRA was never intended to provide, much less mandate, dual coverage. While the majority is correct that COBRA coverage is designed to maintain the status quo of a person's health insurance, it is limited to those specific instances where the individual finds himself, herself, or their dependents without other health insurance coverage. In a situation where the former employee is without coverage, he or she can elect to receive COBRA coverage for a designated grace period of 18 to 36 months, 29 U.S.C. Sec. 1162(2)(A), so that he or she has time to obtain new coverage without entering into serious debt or becoming a drain on public resources. COBRA coverage is merely intended to provide for individuals who are not covered under any medical insurance plan and who elect to maintain their present coverage. It is certainly not intended to provide for individuals who have other health coverage but want to maintain double coverage.[4]
 
 
 52
 By emphasizing the fact that Congress used the phrase "first becomes, after the date of election" to describe when COBRA coverage may be terminated, the majority ignores Congress' 1989 amendment to 29 U.S.C. Sec. 1162(2)(D)(i). Prior to 1989, the statute read that COBRA coverage terminated on the "date on which the qualified beneficiary first becomes, after the date of election[,] ... covered under any other group health plan." Congress recognized the potentially draconian result that inferior coverage could terminate COBRA benefits, so it enacted the 1989 amendment which added that the new group health plan could not "contain any exclusion or limitation with respect to any preexisting condition of such beneficiary." The true import of this statutory provision is not that COBRA coverage only terminates when a person obtains a new policy after the date of election, but rather, that COBRA coverage will only terminate upon the obtention of comparable coverage that contains no limits on preexisting conditions.
 
 
 53
 The Teamsters wants to avoid their responsibilities under Mr. Isch's plan which provides coverage for his wife's medical needs. The majority thinks that it is significant that Mrs. Isch developed her condition while she was covered by the Teamster's plan. Thus, they maintain that it is not a preexisting condition and therefore, the 1989 amendment does not effect this case. Once again, the majority misconstrues, without explanation, the import of the amendment to this case. It is precisely because Mrs. Isch was suffering from Guillane Barre Syndrome while she was covered under the Teamsters' policy that her right to elect COBRA coverage terminated, pursuant to the 1989 amendment of 29 U.S.C. Sec. 1162(2)(D)(i). She was fully covered by the Teamsters' plan, without any limits or exclusions as to her medical expenses for Guillane Barre Syndrome.
 
 
 54
 Thus, I agree with the Eleventh Circuit's interpretation of 29 U.S.C. Sec. 1162(2)(D)(i), and it is only "[i]f there is a significant gap between the coverage afforded under his employer's plan and his preexisting plan, [that] an employee is not truly 'covered' by the preexisting group health plan.... Denying continuation coverage in that setting would serve to frustrate, rather than foster, Congress' clear intentions." National, 929 F.2d at 1571 (emphasis added); see also, Brock v. Primedica, Inc., 904 F.2d 295, 297 (5th Cir.1990) (the 1989 amendment "further emphasizes Congress's concern that group health plan participants and their dependents not be placed in a situation in which they suffer a gap in the character of coverage as the result of a 'qualifying event' such as termination of employment"). People who have preexisting insurance policies, that provide substantially comparable coverage to what they would receive under COBRA, should not be allowed to elect to receive COBRA coverage.
 
 
 55
 The majority claims that this interpretation leads to the draconian result that "inferior pre-existing insurance would disqualify one from receiving COBRA coverage," but once again, they misconstrue the analysis. If there are no significant gaps in coverage between the two policies, then the preexisting policy does not provide inferior coverage. I fail to see anything draconian about such a result, but rather, recognize that it effectuates Congress' purpose in enacting COBRA, and also effectuates Congress' provision for termination of COBRA benefits once a person obtains comparable coverage without any exclusions or limitations regarding preexisting conditions. The "significant gap" analysis effectuates Congressional intent because if there is a gap in coverage and COBRA coverage is not terminated, the patient may have double policies, but in reality, still only has single coverage.
 
 
 56
 The majority speculates that this approach will cause a whole "morass" of litigation in the federal courts, but for unexplained reasons, they overlook the approach taken by the district court:
 
 
 57
 The court must look to the difference in the policies at the time of election and thus determine whether a significant gap in coverage truly existed. In so doing, the policies should be examined to determine their benefits, whether there is any exclusion or limitation on the patient's preexisting condition, and with a view to the treatment the beneficiary may foreseeably require. With respect to any dollar caps on coverage (all that really is at issue here), the 'gap' (if any) must be significant enough to alert a reasonable person of the potential for substantial personal liability under the new plan, that does not exist under the old.
 
 
 58
 (Emphasis added). This assessment necessarily entails a case by case determination, but this need not be the "morass" the majority predicts. Whether or not pre-existing conditions are covered is quite an easy factual question to resolve. All that is left to determine is the amount of coverage, at the time of election, and all post hoc determinations are avoided.
 
 
 59
 At the time that Mrs. Isch was laid-off and became entitled to make a COBRA election, she was covered under her husband's preexisting Teamsters' health insurance plan, and has remained covered under it from that day forward. She had basic benefits, up to $250,000 per year for major medical expenses, and no deductible or co-payments. If, at the time of election, the Teamsters' plan had no foreseeable significant gaps in coverage from Associated's plan, then Mrs. Isch's right to elect COBRA coverage terminated. This termination was simultaneous with her right of election because Congress' clear intent in enacting COBRA, and the 1989 amendment to 29 U.S.C. Sec. 1162(2)(D)(i), was accomplished.
 
 
 60
 The bottom line is that the Teamsters are trying to avoid their contractual responsibilities to the Ischs and Lutheran Hospital. The majority's opinion allows them to do so. I believe, however, that the Teamsters should be required to live up to the terms of their contract with the Ischs and pay for Mrs. Isch's medical expenses because there was no significant gap in coverage when comparing the Teamsters' and Associated's health insurance plans. Mrs. Isch may have lost her dual health care coverage, when she was laid-off from her job, but at no time did she have a statutory right to dual coverage and I refuse to join in an opinion that mandates such coverage.
 
 
 61
 Accordingly, I DISSENT from the majority opinion.
 
 
 
 *
 The Honorable Myron H. Bright of the United States Court of Appeals for the Eighth Circuit is sitting by designation
 
 
 [1]
 Mary Isch was stricken with Guillane Barre Syndrome, an acute, rapidly progressive neurological disorder, and was subsequently forced onto life supports. 845 F.Supp. 1275, 1288
 
 
 [2]
 On January 5, 1995, upon stipulation of counsel, the appeal was dismissed as to defendant Business Men's Assurance Company of America
 
 
 [3]
 We agree with the district court's finding that Mary Isch lost her coverage due to a qualifying event, and thus affirm the court's rejection of Associated's argument that the loss of coverage was due to a change in insurance carriers. 845 F.Supp. at 1284
 
 
 [4]
 In all three cases the amended 1986 version of Sec. 1162(2)(D)(i) was in effect. That version of the statute did not contain the "which does not contain any exclusion or limitation with regard to any pre-existing condition" language found in the 1989 version of the statute applicable to the present case
 
 
 [5]
 We disagree with the suggestion of the dissent that Congress' use of the word "any" in the above-quoted language is somehow dispositive of the issue in this case. A snippet of legislative history does not normally trump the plain language of a statute which, as we have noted, places no such limitation on COBRA coverage. To the contrary, "the plain language of a statute is 'the most reliable indicator of congressional intent.' " Castellon-Contreras v. INS, 45 F.3d 149, 152 (7th Cir.1995), quoting Central States, et al. v. Cullum Companies, 973 F.2d 1333, 1339 (7th Cir.1992). Even if it accurately reflects the Congressional motivation for the enactment of COBRA, the quoted history is not inconsistent with the proper reading of the statute
 The fact that Congress may have been motivated by the plight of a smaller sub-class--people without any health insurance--does not mean that in remedying the situation they necessarily limited relief to that sub-class rather than the larger group, including Mary Isch, who lose jobs and all or part of their insurance.
 
 
 [6]
 Courts including the Eleventh Circuit have relied on these proposed regulations in determining Congressional intent with respect to other aspects of COBRA. See Branch v. G. Bernd Co., 955 F.2d 1574, 1581 (11th Cir.1992)
 
 
 [7]
 Mary Isch does not have a pre-existing condition--she has pre-existing coverage. Her condition developed during the time she was covered under both policies. Therefore, this case is unaffected by the 1989 amendment
 
 
 [8]
 The National court determined that no gap existed because the insured would have been liable for the $6,700 under either the preexisting or the COBRA plans by themselves. The National court thus determined that since the personal liability under either plan was roughly the same there was no "significant gap." The court did not explain why this was the appropriate gap to consider rather than the difference in personal liability between the double coverage and the single pre-existing plan. The court essentially supplanted its own view of what is adequate insurance coverage for that of the employee and his family who had determined that neither plan was adequate and thus opted for coverage under both and was willing to pay the premiums to keep it
 
 
 [1]
 The majority correctly states that COBRA provides that people who lost coverage under their employer's group health care plan due to certain qualifying events may continue to elect coverage, at their own expense, under the same plan for 18 to 36 months, depending on the qualifying event
 
 
 [2]
 The Teamsters' policy has two separate benefit provisions, one for hospital benefits relating to injury or sickness which requires hospitalization, and another for major medical benefits, which also includes injury or sickness which may or may not include hospitalization. The record is unclear which benefit will cover Mrs. Isch's expenses
 
 
 [3]
 For example, many people have a primary insurer provided by their employer, and a secondary insurer, provided by a spouse's employer
 
 
 [4]
 While 29 U.S.C. Sec. 1162(1) requires that continuation coverage must be "identical to the coverage provided under the plan to similarly situated beneficiaries under the plan," Congress also provided for the termination of such coverage once the beneficiary becomes covered under a comparable plan. If we were to follow the majority's position to its logical conclusion, 29 U.S.C. Sec. 1162(2)(D)(i) would be utterly superfluous except in the rare cases in which an employee who leaves a job becomes covered under exactly the same insurance policy as the one used by their former employer. Surely, Congress did not, nor never intended to, craft such a narrow termination provision